**[Cite as *State v. Parks*, 2026-Ohio-1629.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  {48}L-25-00228

    Appellee                                 Trial Court No.  CR0202402781

v.

Tito Parks                                       **<u>DECISION AND JUDGMENT</u>**

    Appellant                                Decided: May 5, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} Appellant, Tito Parks, appeals from a judgment entered by the Lucas County Court of Common Pleas convicting him, following a plea of no contest, of the offense of having weapons while under disability. For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case and the Facts

{¶ 2} This case arises from a traffic stop that occurred on September 4, 2024, at Auburn Avenue and Palmetto Avenue in Toledo, Ohio. On December 17, 2024, the Lucas County Grand Jury indicted Parks for having weapons under disability, a felony of the third degree, in violation of R.C. 2923.13(A)(2) and (B) (Count 1); and improperly handling firearms in a motor vehicle, a felony of the fourth degree, in violation of R.C. 2923.16(B) and (I). Parks entered a plea of not guilty to the charges.

{¶ 3} On May 12, 2025, Parks filed a motion to suppress in which he alleged that he had been subjected to an unreasonable search and seizure and that police had arrested him and searched his vehicle without probable cause. Quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983), Parks pointed out that the scope of a traffic stop must "'be carefully tailored to its underlying justification…and last no longer than is necessary to effectuate the purpose of the stop.'" As facts in support of this motion, Parks alleged only:

> Officers stopped the 2017 Chrysler, driven by Tito Parks on September 4, 2024 for an alleged tint violation. Once outside the Chrysler, they handcuffed Mr. Parks and searched him. Officers searched the vehicle and found a gun. They arrested Mr. Parks and placed him in the police vehicle.

The State filed a response, arguing that: (1) the police had reasonable suspicion to stop Park's vehicle for a window-tint violation; (2) the police did not unduly prolong the traffic stop; (3) Parks was lawfully arrested for failing to comply with a police order to exit the vehicle; and (4) the vehicle was subsequently searched incident to a lawful arrest.

{¶ 4} On June 17, 2025, the trial court held a hearing on the motion to suppress. Toledo Police Department Detective Sergeant Kenneth Krabill testified on behalf of the

2.

State. Krabill's badge-cam video recording of the entire traffic stop was admitted as Defendant's Exhibit A.

{¶ 5} The video recording depicted in Defendant's Exhibit A shows the following. Krabill initiates the traffic stop at 2:44:51 p.m. At 2:45:07, he approaches Parks' vehicle and informs Parks that he has stopped the vehicle because the "windshield can't be tinted." Krabill obtains Parks' Michigan driver's license and returns to his unmarked patrol vehicle.

{¶ 6} At 2:46:20, Krabill can be seen holding Parks' driver's license in his left hand and typing can be heard. At 2:46:30, Krabill uses his radio to state his location and that there was "traffic" on a Michigan plate. After providing the plate information and a description of Park's vehicle, he immediately asks if a "drug K-9" is available. Krabill then waits in the car. Intermittent typing can be heard once more in the background.

{¶ 7} At 2:58:01, the drug unit with a K-9 arrives on scene, pulling up behind Krabill's vehicle. Krabill exits his vehicle and asks the drug unit, "Do you want him out?" The drug unit answers in the affirmative. At 2:58:29, Krabill requests that Parks exit his vehicle. Krabill explains that Parks needs to get out in order to protect the K-9 from getting run over. Parks refuses and argues with Krabill, telling Krabill that he has not broken any laws. At 2:59:50, Krabill returns to his vehicle and requests that another unit respond to the scene to "pin" Parks' vehicle. At 3:00:30, another unit arrives and pins Parks' vehicle by parking in front of it.

3.

{¶ 8} Parks continues to refuse to exit his vehicle and argues with Krabill. At 3:02:25, Krabill places Parks under arrest for failing to obey a lawful order. Parks is removed from the vehicle and placed in handcuffs. At 3:04:46, Krabill and other officers begin searching Parks' vehicle. At 3:09:40, Krabill measures the tint on Parks' window and observes it to be at five percent. At 3:10:36, Krabill tells another officer he needs to "get a tow going."

{¶ 9} At 3:12:34, another officer finds a firearm in Parks' glove compartment.

{¶ 10} At 3:13:09, Krabill uses his cell phone to telephone to request a "triple I" at 3:13:20. While remaining on the phone, he asks Parks to name the county he resides in. At 3:15:55, Krabill asks Parks for his social security number "for the ticket."

{¶ 11} At 3:18:21, Krabill informs the person on the other end of his telephone call that he has Parks' "soc," "if you want it that way." Krabill gives that person Parks' social security number at 3:18:38. Krabill is still on the telephone at 3:21:15. At 3:21:30, Krabill receives information from the person on the phone, to which Krabill responds, "These are all convictions?" At 3:22:11-39, Krabill can be heard telling another officer a "triple I" could not be found using Parks' name and date of birth.

{¶ 12} At the hearing on the motion to suppress, Krabill testified that he stopped Parks' vehicle for a window tint violation. Krabill stated that he "believe[d]" he had attempted to run Parks' information through a database "with the plate." He stated that "[w]ith Michigan, though, the information is limited and it's hard to, like, sort through."

4.

He stated that while he was running Parks' information, he "called for a drug K-9 to come to [the] traffic stop."

{¶ 13} He stated that "we gave [Parks] several orders…to exit the vehicle, to come back near our car for the K-9 safety so they [could] do the sniff without anything happening to the dog. It was at the request of the K-9 officer." Krabill further stated that despite the numerous requests, Parks refused to obey the police orders, and so Parks was eventually arrested for failing to comply with lawful orders. Krabill stated that during the search of Parks' vehicle that occurred following the arrest, they found "a loaded revolver in the glove box." He further stated that after the search of the vehicle he tested the window tint and found it to be five percent, which is significantly darker than is allowed by law.

{¶ 14} Krabill testified on cross-examination that when he stopped Parks, he was suspecting drug activity inasmuch as Parks was in a "high drug area," in a "tinted out minivan, which is a common thing that drug dealers use to transport drugs."

{¶ 15} Krabill testified that he "believe[d]" he "started working on [the ticket] until the K-9 got there." He agreed that approximately 15 minutes elapsed from the time he stopped Parks' vehicle until Parks was asked to exit the vehicle. Krabill could not recall whether during that period he ran Parks' record. Nor could he answer approximately how long it took him to write the ticket. He stated that it normally takes "probably 10 to 15 minutes" to write a traffic ticket, "just depending on the computers."

5.

Later, on recross-examination, he testified that a traffic stop takes "on average probably 15 to 20 minutes."

{¶ 16} When the trial court asked Krabill whether he had completed writing the ticket for the tint violation prior to approaching Parks to ask him to step out of his vehicle for the K-9 search, Krabill answered, "I honestly don't recall, sir. I believe I started filling it out."

{¶ 17} Following the hearing, the parties submitted post hearing briefs. Both parties addressed the question of whether the traffic stop in this case was unconstitutionally extended.

{¶ 18} On July 22, 2025, the trial court entered a decision and judgment entry denying Parks' motion to suppress. In that judgment entry, the trial court found the following facts:

> Defendant was driving on Auburn Street when he was spotted by Detective Sergeant Kenneth Krabill for driving with tint that was too dark on his window, as well as having a tinted windshield. Based on these violations, Det. Sgt. Krabill turned around on Auburn and initiated a traffic stop. The officer left his vehicle to interact with Defendant at 2:44:50 according to the recording from his body camera. Det. Sgt. Krabill returns to his vehicle to start writing the traffic ticket at 2:45:40 and at 2:58:00, the officer leaves his vehicle to speak with Defendant again. In this interaction, Det. Sgt. Krabill informed Defendant that a K9 unit was on scene, and that the K9 unit had asked that Defendant exit his vehicle for the safety of the dog. This unit arrived on scene by 2:58.
>
> Defendant refused to exit his vehicle and eventually was removed from it by force. Defendant was then under arrest for failure to comply with a police order and officers on scene proceeded to search the vehicle incident to arrest. During that search, a revolver was found in the glove box. Defendant received a ticket for the tint violation and was charged with

6.

having weapons under disability and improperly handling firearms in a motor vehicle.

{¶ 19} Ultimately, the trial court denied the motion to suppress, based on the following analysis:

The Court finds that the overall amount of time between the stop being initiated and the time that the K9 arrived on scene was not unreasonable as it was just under fifteen minutes. The Court notes that at the hearing, Det. Sgt. Krabill testified that a typical stop either takes between ten and fifteen minutes or between fifteen and twenty minutes.[]

The officer returns to his vehicle and calls in Defendant's information and the license information. He also seeks to have a drug dog respond to the scene. Det. Sgt. Krabill then utilizes the computer in his patrol vehicle to look up Defendant's information and begin the ticket writing process. At 2:58, the drug dog and his officer arrives on scene and Det. Sgt. Krabill then asks the K9 officer if he would like Defendant out of the vehicle. Unlike the cases cited above, we have no testimony from the officer that the ticket was completed prior to the search by the drug sniffing dog or evidence on the body cam footage that no further actions were taking place in order to effectuate the ticket. As such the motion to suppress is denied on this basis.

As to Defendant's argument that the stop was pretextual, the officer provided sufficient testimony that a de minimis traffic violation had occurred and that the intention of the officer that day was to pull anyone over in the area who had committed a traffic violation. As the stop was based on sufficient evidence that a traffic violation had occurred, the subjective intentions of the officer are not at issue here. As such, the Court denies the motion to suppress on this basis.

(Footnote omitted.).

{¶ 20} On August 18, 2025, Parks entered a negotiated plea of no contest to having weapons while under disability, a felony of the third degree, in violation of R.C. 2923.13(A)(2) and (B). As part of the plea agreement, the State entered a nolle prosequi as to Count 2 of the indictment.

7.

{¶ 21} The trial court proceeded immediately to sentencing and imposed a term of 24 months in prison. Parks timely filed an appeal.

## Assignments of Error

{¶ 22} On appeal, Parks asserts the following sole assignment of error:

> I.     The trial court erred in denying Mr. Parks' motion to suppress.

## Law and Analysis

{¶ 23} In arguing that the trial court erred in denying Parks' motion to suppress, Parks challenges the trial court's finding that Krabill did not unreasonably prolong the stop. "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶ 24} The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, Section 14 of the Ohio Constitution is almost identical and "affords the same protection in felony cases." *State v. Eatmon*, 2022-Ohio-1197, ¶ 27.

8.

{¶ 25} To determine whether the traffic stop and discovery of the gun constituted an unreasonable search and seizure, we must first determine whether Krabill had probable cause to believe that Parks committed a traffic violation. The Ohio Supreme Court held in *Dayton v. Erickson*, 76 Ohio St.3d 3 (1996), that "where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." *Id.* at 11-12. Here, we find the stop for a window tint violation was valid, even if pretextual. *See State v. Davenport*, 2017-Ohio-688, ¶ 19 (2nd Dist.) ("whether pretextual or not, it is well established that a traffic violation, including a tint violation, gives an officer a reasonable articulable suspicion justifying a traffic stop").

Next, we must determine whether Krabill unreasonably delayed the traffic stop after the K-9 officer arrived and Krabill got out of his patrol car to assist him. The law is well-settled that "'[t]he use of a drug dog to sniff the exterior of a vehicle, lawfully detained, is not a search within the meaning of the Fourth Amendment.'" *State v. Patterson*, 2025-Ohio-5671, ¶ 39 (6th Dist.), quoting *State v. Jones*, 2019-Ohio-3704, ¶ 18 (6th Dist.). (Additional citations omitted.) "But, absent additional reasonable suspicion of drug activity, 'a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.'" *Patterson* at *id.*, quoting *Rodriguez v. United States*, 575 U.S. 348, 250 (2015). "'In determining the reasonableness of a detention, the court must look at the totality of the

9.

circumstances.'" *Patterson* at *id.*, quoting *State v. Harper*, 2022-Ohio-4357, ¶ 34 (4th Dist.), quoting *State v. Matteucci*, 2003-Ohio-702, ¶ 30 (11th Dist.).

{¶ 26} "A seizure justified only by a police-observed traffic violation…'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez* at 1612, quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The pivotal inquiry is "whether conducting the sniff prolongs – i.e., adds time to – the stop." *Rodriguez* at 1616 (internal quotation marks omitted).

{¶ 27} "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop." *Id.* at 1615, quoting *Caballes* at 408. Such inquiries typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez* at *id.*; *see also Patterson* at ¶ 41; *State v. Batchili*, 2007-Ohio-2204, ¶ 12 (the time needed to handle a traffic violation includes "the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates").

{¶ 28} In addition to making allowable inquiries, an officer making a traffic stop may also take "certain negligibly burdensome precautions," such as "requiring a driver, already stopped, to exit the vehicle," "in order to complete his mission safely." *Rodriguez* at 1615-1616. On the other hand, "safety precautions taken in order to facilitate" investigation of other crimes detour from the traffic mission. *Id.* at 1616.

10.

{¶ 29} In determining whether an officer completed the allowable tasks within a reasonable length of time, "the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation." (Internal quotations omitted.) *Patterson* at ¶ 41, citing *Batchili* at ¶ 12. (Additional citations omitted.)

{¶ 30} In this case, the trial court found that once Krabill returned to his vehicle following his initial interaction with Parks, he called in Parks' information and then "utilize[d] the computer in his patrol vehicle to look up [Parks'] information and begin the ticket writing process." Observing that Krabill subsequently left his vehicle to instruct Parks to exit his vehicle for the safety of the drug-sniffing dog, the trial court concluded that the traffic stop was not unlawfully extended because there was "no testimony…that the ticket was completed prior to the arrival of the drug sniffing dog," and no evidence "that no further actions were taking place in order to effectuate the ticket."

{¶ 31} "[O]nce a traffic stop has been validly initiated, an officer is entitled to complete the mission of the stop." *State v. Fips,* 2026-Ohio-1207, ¶ 12. Here, there was no evidence supporting the conclusion that the traffic stop was prolonged beyond the time reasonably required to complete the traffic stop's mission. *See Rodriguez* at 1612, 1616.

{¶ 32} In this case, the evidence shows that Krabill called for the K-9 unit at the same time he was running the computer check on Parks' driver's license. This court has recently determined that a traffic stop was not unreasonably prolonged where, as here, the

11.

officer conducting the traffic stop called for a K-9 unit while engaged in the process of investigating the defendant's record for purposes of the traffic stop. *See Patterson* at ¶16-18, 42.

{¶ 33} The evidence additionally shows that the dog sniff was done before the traffic stop was completed. The video tape of the traffic stop shows that when the K-9 unit arrived on the scene, Krabill had not completed checking the identification of the occupants by radio with dispatch or on the police car computer. Although Krabill did pause during his checking of Parks' identification on the police car's computer, for approximately four minutes beginning when the K-9 arrived to do the dog sniff until Parks was arrested for failure to comply, the evidence does not support that this pause in any way prolonged the duration of the traffic stop. Instead, it shows that even if Krabill had not paused for four minutes to assist with the dog sniff, the traffic stop would not have been concluded any earlier than it was, because at the time of Parks' arrest Krabill had still not received all information back from dispatch. Thus, the evidence demonstrates that the traffic stop was prolonged not by Krabill's pause in issuing the traffic citation, but rather by the length of time it took for dispatch to get Krabill the computer records-check information. *See Batchili* at ¶ 14 (holding that "[a] traffic stop is not unconstitutionally prolonged when permissible background checks have been diligently undertaken and not yet completed at the time a drug dog alerts on the vehicle.")

{¶ 34} Parks' sole assignment of error is found not well-taken.

12.

**Conclusion**

{¶ 35} The judgment of the Lucas County Court of Common Pleas is affirmed.

Appellee is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

Thomas J. Osowik, P.J.
_____
JUDGE

Gene A. Zmuda, J.
_____
JUDGE

Charles E. Sulek, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.